McGOWAN *et al.* v. THE ST. LOUIS ORE & STEEL COMPANY, *Appellant.*

---

IN BANC.

---

1. **Contributory Negligence.** Contributory negligence is a matter of defense, and not for mitigation of damages.

McGowan v. The St. Louis Ore & Steel Co.

2. **Negligence:** R. S. 1879, SEC. 2122: DAMAGES. Damages recoverable under Revised Statutes, 1879, section 2122, for the death of one caused by the negligence of another are such as will compensate for the pecuniary injury necessarily resulting from such death.

3. ———: INSTRUCTION ON MEASURE OF DAMAGES. An instruction in such action that, if the jury find for the plaintiffs "they will assess the damages in such sum as they believe will compensate them for the pecuniary injury sustained by them in the death of deceased not in excess of the sum of $5,000," is erroneous in not furnishing the jury with a sufficiently definite rule for the measure of damages.

4. ———: ———: HARMLESS ERROR. The giving of such instruction is, however, harmless where the verdict is only for $5,000, and the plaintiffs are four minor children, and are clearly entitled to recover the aggregate sum returned in the verdict. [SHERWOOD, C. J., GANTT and MACFARLANE, JJ., dissenting.]

*Appeal from St. Louis City Circuit Court.*—HON. JAMES A. SEDDON, Judge.

AFFIRMED.

*Hitchcock, Madill & Finkelnburg* for appellant.

(1) The damages awarded by the jury were excessive, and not warranted by the evidence. 2 Sedgwick on Damages, p. 541, note 8; *Parsons v. Railroad*, 94 Mo. 286, 300. (2) The subject of damages was not properly placed before the jury. *Railroad v. Weldon*, 52 Ill. 290; 3 Sutherland on Damages, p. 282. (3) The instruction on the subject of damages, given to the jury at the plaintiffs' request, was erroneous, insufficient and misleading and ignored important elements which, under the statute in such cases, should have been brought to the attention of the jury. R. S., sec. 4427. (4) The instruction of damages asked by defendant should have been given. *Owen v. Brockschmidt*, 54 Mo. 285; R. S., sec. 4427.

*Laughlin, Kern & Tansey* for respondents.

(1) The instruction given by the trial court for respondent on the measure of damages wes proper and

sufficient. *Tetherow v. Railroad*, 98 Mo. 74; *Smith v. Railroad*, 92 Mo. 559; *Rohrer v. Railroad*, 91 Mo. 509; *Hurt v. Railroad*, 94 Mo. 255. (2) Besides, the appellant asked for an instruction almost identically like the one complained of by it, and is now estopped to complain. *Noble v. Blount*, 77 Mo. 235; *Leabo v. Goode*, 67 Mo. 216; *Bank v. Armstrong*, 92 Mo. 279.

GANTT, J.—This is an action by respondents in the circuit court of the city of St. Louis to recover damages on account of the death of their father, Michael McGowan, on the tenth of December, 1883, by falling down an elevator chute on the premises of appellant, the St. Louis Ore & Steel Company, under sections 4426 and 4427.

The petition is as follows:

"Plaintiffs state that they are infants under the age of twenty-one, and that John G. Gay, Jr., was on February 7, 1884, duly appointed by above circuit court as the next friend of the said plaintiffs to institute this suit on their behalf, and for a cause of action state that they are the children of one Michael McGowan who died December 10, 1883; that said Michael McGowan left no widow surviving him; that defendant is a corporation duly organized and existing under the laws of Missouri; that defendant was at and prior to the day above mentioned the owner of certain ore and steel works in or near the city of St. Louis, Missouri; that at and prior to said date said Michael McGowan, deceased, was employed by defendant in the said ore and steel works as a laborer to pull certain loaded trucks from an elevator in an elevator chute of great height, to unload the same and to return the same when unloaded to the entrance to said elevator chute, and then and there to place the same upon said elevator; that at said time and place it was defendant's duty to have said

elevator at said entrance to said elevator chute and to have the said entrance to said elevator chute safely and securely guarded, fenced and lighted as defendant well knew or by the exercise of reasonable care could have known; that on said tenth day of December, 1883, defendant did not have said elevator at the said entrance to said elevator chute, nor did it have said entrance to said elevator chute safely and securely guarded, lighted and fenced as it was its duty to do; that at said time and place whilst said Michael McGowan was occupied in the discharge of the said duties of his employment in defendant's said iron, ore and steel works he was precipitated down said elevator chute with such force as to then cause his death almost instantly by reason of defendant's said neglect to have said elevator at said entrance to said elevator chute and to have said entrance securely and safely guarded, fenced and lighted, he being then and there free from all neglect in the premises.

"Plaintiffs further say that by reason of the premises aforesaid, and by virtue of provision of section 2122 of the Revised Statutes of Missouri, 1879, they have sustained damages in the sum of $5,000, for which said sum they pray judgment."

To which petition the defendant filed the following answer:

"Now comes the St. Louis Ore & Steel Company, defendant, and for answer to the petition of plaintiffs in the above-entitled cause says: That defendant has not knowledge or information sufficient to form a belief whether said plaintiffs are or either of them is an infant, nor whether Michael McGowan was their father, nor whether said Michael McGowan left no widow surviving him. Defendant is informed and, therefore, admits that on or about December 10, 1883, one Michael McGowan, who was before then employed by

defendant as a laborer at certain steel works owned by defendant in the city of St. Louis, commonly called the Vulcan steel works, came to his death by falling down an elevator shaft or chute at said steel works. But defendant denies generally each and every other allegation in said petition contained.

"Defc idant further answering says that said McGowan directly contributed to and in part caused his own death by the negligent and reckless manner in which he undertook, on or about said tenth of December, 1883, to push a heavy iron truck, which it was his duty to assist in moving backwards and forwards from said elevator opening; that said McGowan well knew the situation of said elevator opening and that it was necessary to approach the same with care; but said McGowan at the time aforesaid so negligently and recklessly pushed said truck towards and into said opening that said truck was precipitated down the same, and said McGowan in attempting to hold back the same was in consequence of his own recklessness dragged down said opening and thereby injured so as to cause his death. And having fully answered said petition defendant prays to be hence dismissed with its costs."

The reply was a general denial of new matter set up in the answer.

At the trial, on March 21, 1888, respondents, to sustain the issues on their part, introduced evidence, in substance, as follows: John McGowan testified that his age was twenty years; that he had two brothers and a sister, viz.: James McGowan, eighteen years; Mary McGowan, seventeen years of age, and Michael McGowan, ten years of age, and that witness was sixteen when his father Michael died; that his mother died some time before his father was killed; that they lived in south St. Louis when his father died, and had

lived there as long as he could remember; that he and his brother James are employed by the Western Steel Company (the same works formerly operated by the St. Louis Ore & Steel Company); that his sister is earning wages as a house servant, and that his younger brother is in an orphan asylum; that in December, 1883, his father worked for the St. Louis Ore & Steel Company, and lost his life by falling down a shaft,—it was on the tenth day of December, 1883; that he was forty years of age; witness was also working for the St. Louis Ore & Steel Company at the time of the accident; witness saw him shortly after the accident, but he was unconscious; was not present when the accident occurred; he died on the day of the accident at the Alexian Brothers' hospital, to which place he was removed by respondents; he was buried by the family, the expenses of hospital and burial being paid out of the wages due him and the furniture that was sold. Deceased had just gone on duty for the morning when he was killed; he started to go to work at about three o'clock that morning. He was paid by the ton, and had been earning about $3 a day.

On cross-examination witness testified that his father left some property; that he owned the dwelling-house in which he lived, also a tenement house which he let to tenants for rent, also a store in East St. Louis. Witness, his brother James, and his sister, were all earning wages. There was a mortgage on all the real estate; the property in Missouri was sold and brought nothing over the mortgage; the Illinois property had not yet been sold. His father was killed on Monday morning; Saturday had been his day off; he had been at work Friday; had been at work for the ore and steel company since March; was killed in December; during all this time he had been doing the same kind of work, pushing buggies.

On re-examination witness stated that the Carondelet property had been swept away by mortgages, and that the creditors were now proceeding to sell the East St. Louis property, and that there was nothing left for his children.

Patrick Quinn testified that in December, 1883, he was working for the ore and steel company in the converting department of the Vulcan works, on the charging floor, and about fifty feet above the ground floor, about three or four ordinary stories high. Witness went to work about four o'clock on Monday morning, December 10, 1883; it was still dark; Michael McGowan was there; he worked on the same floor; witness was engaged in charging cupolas. Peterson was the superintendent of the whole works, Shea was the boss or foreman of the works, Shaneyman was the select foreman; he was the boss charger; was the first man on the floor. "My duty was charging cupolas with pig-iron which we got from the hoist or elevator, which was on the north part of the floor. The iron was brought up the elevator on iron buggies; one man could push an empty buggy, but it took two to push a loaded one; the iron is melted in the cupolas. When a loaded buggy came up on the elevator the men would pull it off when it came up even with the floor, take it to the cupola and throw the material in; one man would push the buggy, and one would pull it. The empty buggies were pushed back onto the elevator to be let down." Witness saw a gate or door there that closes up the elevator hole when the elevator was not up at the floor, but it was not there at the time of the accident. It worked this way: when the cage came up with the buggy it was elevated up and staid up, and when they took the buggy off it would drop down in its place and close the hole. There were two sides to this elevator, one goes up, and one goes down, but

believes the gate was not working that way when McGowan was killed. He had an empty buggy going back after unloading it, going back to the hoist to put the empty buggy on, and he went into the wrong hole. He went into this one that went down; there were two holes that went down; witness was not far away, but had nothing to do with the buggies; the buggies were handled by Grossgrass, Bishop, Chaney and McGowan. Witness was throwing material into the cupolas when the accident happened. There was light there from the cupolas; there may have been lamps, but witness couldn't tell whether there was or not. The cupolas made a light, of course. When the cupola is running there is a light there, of course, in the hoist lighting up around there. Witness explains that there is an opening in each cupola where the stuff is thrown in, and that light issues from these openings. The elevator was about twenty feet from the nearest cupola. Witness did not actually see the accident, but heard cries immediately that a man had gone down the wrong hole with a buggy; two of them went down, Grossgrass and McGowan. Witness ran down right away and found them lying down at the bottom of the hoist; Grossgrass was dead; McGowan was lying on the broad of his back along the hoist on the bottom below.

On cross-examination witness said there were four iron cupolas and four spiegel cupolas on that charging floor; "don't think they were all lit up that morning, think there were two or three lit up, couldn't say whether they were all lit up or not, not sure now; never thought of it; each cupola lets out light when the blast is on. A good deal of light comes out of these cupolas." Thinks McGowan had been at work on this floor for six months at the same kind of work, moving these buggies into the hoist. "Could not say that the

men who worked the buggies did not light the gates; don't know who took the gate away; don't know how long it had been away, whether one, two or three weeks or a month before this accident happened; know it wasn't there that morning; don't remember that the gate disappeared from time to time, and that it was replaced by the superintendent; don't know that some of the men complained of McGowan as being too violent a pusher." Witness saw McGowan before he went into the wrong elevator hole; he was pushing the buggy in the rear and Grossgrass was pulling in front.

Other workmen testified as to the manner in which the deceased did his work, the lighting of the premises around the mouth of the elevator and the character of the gate that was constructed to guard the openings in the elevator.

It may be stated that the evidence fairly discloses that deceased and his fellow-workmen were working rapidly in moving the buggies or small cars with the pig iron from the elevator to the cupolas, unloading them and returning the empty buggies to the elevator; that on one of these return trips they lost their way in the dark and hurry and both fell in the elevator and were killed.

On the part of the defendant it was quite clearly shown that it was not customary in other similar iron works to guard the elevators with these gates; that McGowan knew all about the risk and construction of these works; that a man was employed to keep lamps for them, and if any workman needed a lamp he could go to this man and get one. When the cupolas were running they furnished light for this floor from which McGowan fell.

The court thereupon gave the following instruction for the plaintiff: "1. The court instructs the jury that if they find for the plaintiffs they will assess the

damages in their favor in such sum as they believe will compensate them for the pecuniary injury sustained by them in the death of said Michael McGowan, not in excess of the sum of $5,000."

To the giving of which instruction the defendant at the time duly excepted.

And the court also gave the following instruction asked by defendant: "1. If the jury believe from all the evidence in this case that the death of Michael McGowan was the result of a mere accident or misadventure, and that the same was not caused by any negligence on the part of defendant, or its servants, then they must return a verdict for the defendant."

The defendant upon its part also prayed the court to instruct the jury as follows: "2. If the jury find from the evidence that the deceased, Michael McGowan, was guilty of any negligence that directly contributed to the accident which caused his death, then the jury will find a verdict for the defendant.

"3. Although the jury may find from the evidence that the defendant was negligent in not maintaining a gate at the entrance of the elevator in question, yet if the jury further find from the evidence that the deceased, Michael McGowan, had knowledge of the absence of such a gate, and with such knowledge carelessly pushed the buggy or truck into the open elevator entrance thereby causing the accident which led to his death, then the jury will find a verdict for the defendant.

"4. The court instructs the jury that if Michael McGowan, on account of whose death as alleged in the petition this action is brought, was in the employment of the defendant company, as in said petition alleged, said Michael McGowan by accepting said employment assumed all the risks attending the employment he undertook other than such as might result from negli-

gence or default on the part of the defendant. If, therefore, the jury believe 'from the evidence that Michael McGowan was employed by defendant as a laborer and came to his death at or about the time alleged in the petition, but also believe from the evidence that the death of said McGowan was caused by the negligence or misconduct of any person who was a fellow-servant or employe in the same general employment as said McGowan, then plaintiffs cannot recover in this action.

"5. If the jury find from the evidence that the defendant had provided a sufficient light for the elevator entrance here in question, but that on the occasion of the accident the said light had been removed, either by deceased, Michael McGowan, or a fellow-servant of his in the same general line of employment, then the defendant is not to be charged with any negligence, by reason of the absence of such light.

"6. If the jury find a verdict for plaintiffs, they will assess the damages at such sum (not exceeding $5,000) as they may deem fair and just with reference to the necessary injury resulting to plaintiffs from the death of Michael McGowan, having regard to any mitigating or aggravating circumstances attending the cause of the death."

Which instructions the court refused to give, to which action of the court in refusing said instructions as asked, defendant at the time duly excepted.

And thereupon the court gave the following instructions of its own motion: "If the jury find from the evidence that the deceased, Michael McGowan, was guilty of any negligence that directly contributed to the accident which caused his death, then the jury will find a verdict for the defendant, and by negligence is meant the absence of that care which a prudent and careful man would exercise under like circumstances.

"Although the jury may find from the evidence that the defendant was negligent in not maintaining a gate at the entrance to the elevator in question, yet if the jury further find from the evidence that the deceased, Michael McGowan, had knowledge of the absence of such a gate, and with such knowledge negligently pushed the buggy or truck into the open elevator entrance, thereby causing the accident which led to his death, then the jury will find a verdict for the defendant, and by negligently is meant not exercising that degree of care as would be reasonably expected of a careful and prudent man under the same circumstances.

"The court instructs the jury that if Michael McGowan, on account of whose death as alleged in the petition this action is brought, was in the employment of the defendant company, as in said petition alleged, said Michael McGowan, by accepting said employment, assumed all the risks attending the employment he undertook which he knew, or, by the exercise of reasonable care, might have known. If, therefore, the jury believe from the evidence, that Michael McGowan was employed by defendant as a laborer and came to his death at or about the time alleged in the petition, but also believe from the evidence that the death of said McGowan was caused by the negligence or misconduct of any person who was a fellow-servant or employe in the same general employment as said McGowan, without any negligence of defendant directly concurring therein and contributing thereto, by its superintendent or foreman, then the plaintiff cannot recover in this action.

"If the jury find from the evidence that defendant had provided a sufficient light for the elevator entrance here in question, but that on the occasion of the acci-

dent the said light had been removed by a fellow-servant of McGowan in the same general line of employment, then the defendant is not to be charged with any negligence by reason of the absence of such light, if the defendant's superintendent and foreman did not know and could not by ordinary care have known of the absence of said light. But the superintendent and foreman of the defendant whose duty it was to direct the men in their work is not a fellow-servant of the man under them. By ordinary care is meant such care as a prudent and careful person would exercise under the like circumstances."

To the giving of which instructions defendant at the time duly excepted.

Under these instructions of the court the jury found a verdict for the plaintiffs in the sum of $5,000, and within four days thereafter the defendant filed its motion for a new trial, which being overruled appealed to this court.

The contention in this case is narrowed down to the instruction given for the plaintiff as to the measure of damages, and the refusal of the defendant's sixth instruction.

It seems to be conceded that the court gave the defendant proper instructions on contributory negligence and assumption of the risks of the employment, in which deceased was engaged at the date of his death.

The court correctly held that, under the state of evidence in this case, there were no facts that called for any instructions on the subject of exemplary damages. Nor do we think the evidence would have justified an instruction in mitigation of the damages based upon the contributory negligence of McGowan. " As a general rule, contributory negligence is never looked to in mitigation of damages, and whenever it is

a defense at all it is a complete defense to the action."
Beach on Contributory Negligence [1 Ed.] sec. 24.

In this case, the right to recover is based solely
upon the negligence of defendant, and the plaintiffs
are only entitled to recover such damages as will com-
pensate them for the pecuniary injury *necessarily*
resulting to them from the death of their father. This
is the uniform rule under English and American
statutes similar to that under which this action is
brought.   *Tilley v. Railroad*, 29 N. Y. 252; Shearman
& Redfield on Negligence, sec. 610; Field on Damages,
sec. 630; *Railroad v. Weldon*, 52 Ill. 295; *Donaldson v.
Railroad*, 18 Iowa, 290; *Coates, Adm'x, v. Railroad*, 62
Iowa, 493; *Railroad v. Butler*, 57 Pa. St. 338; *Coal Co.
v. McEnery*, 91 Pa. St. 189; *Kesler v. Smith*, 66 N. C.
157; *Burton v. Railroad*, 82 N. C. 504; *Telfer v. Rail-
road*, 30 N. J. L. 210; *Railroad v. Ogier*, 35 Pa. St. 72;
*Kelly v. Railroad*, 48 Fed. Rep. (Iowa) 663; *Railroad v.
Wilson*, 48 Fed. Rep. 61; *Carlson v. Railroad*, 28 Pac.
Rep. 497.   And this is the recognized doctrine in this
court.   *Parsons v. Railroad*, 94 Mo. 286; *McPherson v.
Railroad*, 97 Mo. 253.   And it is clear that neither the
physical pain of the deceased nor mental sufferings of
the surviving family can be taken into the estimate.

The instruction given for the plaintiff, so far as it
goes, embodies this view of the law as an abstract
proposition, but it is challenged by the defendant as
being too general to be of any practical utility in guid-
ing the jury.

It is insisted and urged that "it launches the jury
upon a broad sea without compass, or without any land-
marks to regulate their course."   It is unquestionably
the duty of the court to direct the minds of the jury " to
those elements on which their estimate (of damages)
should be made.   It is error to submit such cases with
the general instruction that the jury may find such

damages as, in their judgment from the evidence in the cause, the plaintiff ought to recover; thus giving the jury free scope to give such damages as, according to their individual notions of right and wrong, * * * unguided by any legal rule as to the elements." 3 Sutherland on Damages, 731; *Hawes v. Stock-Yards Co.*, 103 Mo. 60; *Keightlinger v. Egan*, 65 Ill. 235. "An intelligent jury, from common experience, may determine approximately, in any given case, what amount would compensate a parent for all pecuniary losses sustained by reason of the death of a minor child, but, unless they are distinctly informed that such compensation is to be limited to the value of the child to the parent during the period of its minority, they are liable, under a general instruction, * * * to base their estimate upon all the probable or possible benefits that such parents might derive from the life of such child during the whole course of its probable existence, and thus measure the parent's damages by a standard not contemplated in the law." *Parsons v. Railroad*, 94 Mo. 296; *McPherson v. Railroad*, *supra*; *Stoher v. Railroad*, 91 Mo. 509.

Measured by these rules, it seems that this instruction is entirely too general. Indeed, it furnishes no rule or guide, whatever, to the jury. It is true it tells them they may give plaintiff such damages *as they believe* will compensate them for the pecuniary injury sustained by the death of their father, but they are given no rules by which they may arrive at this pecuniary injury; none of the elements which the law recognizes as competent parts of pecuniary capital are pointed out to the jury. The damages are allowed for the "necessary injury" resulting from the death of the injured to the survivors. It is purely a statutory right, and, while the same certainty of loss required in other actions cannot be established in the very nature

of things, and the damages are largely prospective, still there are certain principles recognized in nearly all these cases that will lead to a rational verdict.

They are well stated in the case of *Railroad v. Wightman's Adm'r*, 29 Gratt. 431. In that case, the court instructed the jury that, in assessing the damages for the death of the husband and father, they should assess the same "*with reference to the pecuniary loss sustained by the wife and children (of the deceased), first*, by fixing the same at such sum·as would be equal to the probable earnings of the deceased * * * taking into consideration his age, business capacity, experience and habits, health, energy and perseverance of the deceased during what would probably have been his lifetime if he had not been killed; *second*, by adding these to the value of his services in the superintendence, attention to and care of his family and education of his children of which they had been deprived by his death." *Railroad v. Barrons*, 5 Wall. 90; 3 Sutherland on Damages, pp. 282, 283, and cases cited; *Kelley v. Railroad*, 48 Fed. Rep. 663.

In that class of cases in which the jury would be warranted in giving exemplary damages by reason of the aggravation attending the act, much must be left to the jury; but even in those cases the jury should not be left to grope in the dark, but the court should point out, by appropriate instructions, what facts or circumstances should have the effect of aggravating the damages. *Parsons v. Railroad, supra.* And it was said in that case, that, "in that class of cases where a reasonably safe standard is afforded by the circumstances of the case, by which the compensation in damages can be measured, such standard should be given to the jury not necessarily in terms by which the amount is to be exactly determined with mathematical certainty, but the reasonable limits within which the calculations

ought to be confined should be stated. And as it is undisputed that, as to all classes of cases under this act, no damages can be given * * * by way of *solatium* for mental anguish or distress, for the death or for the loss of the society of the deceased; so, of that principle, the jury ought also to be advised.''

Now, in this instruction in this case, the jury are not even required to find, from the *evidence* in the case, the value of McGowan's life to his children. They are told to give them such sum *as they believe* will compensate them. The estimates that men put upon life are so various that it would be the wildest conjecture as to the result of their guesses, under such an instruction. Certainly the jury should be confined in making their assessment to the evidence tending to show the value of the life that has been taken. *Rolling Mill Co. v. Morrissey*, 111 Ill. 646; *Railroad v. Syke's Adm'x*, 96 Ill. 162.

We would not be misunderstood. If the instructions of the court otherwise correctly submit the case to the jury, the mere unintentional omission to state they must find their verdict ''from the evidence'' will not justify a reversal of the case.

We mean simply to emphasize the fact, that in this case the court not only did not furnish the jury with the proper elements of damages, but did not even confine them to the evidence in the case, but as was said in *Hawes v. Stock-Yards Co., supra*, ''gave them a roving commission to conjecture the consequences of plaintiff's injuries however remote, and to apply such measure of compensation therefor as might to them seem appropriate, without reference to the legal rules for determining the limits of such compensation.''

The verdict in this case is for the largest sum permitted by the statute. It cannot be said the instruction was harmless; the general rule is that it ought to appear affirmatively that it was not prejudicial.

But it is argued on the rehearing, that inasmuch as the defendant asked an instruction as follows: "6. If the jury find a verdict for plaintiffs, they will assess the damages at such sum not exceeding $5,000, as they may deem fair and just with reference to the necessary injury resulting to plaintiffs from the death of Michael McGowan, having regard to any mitigating or aggravating circumstances attending the cause of death," which was refused by the court, that it cannot now be heard to complain of the instruction given for plaintiff.

On what principle of law or justice a defendant is estopped from complaining of an error of the trial court against which he protested at the time, we cannot understand. Had the defendant asked and *obtained* an instruction in its behalf, tendering the same issue to the jury, we readily agree it could not complain. *Hazell v. Bank*, 95 Mo. 66, and numerous other cases in this court. In all the cases in this state where it is held that a party is estopped by asking instructions tendering the same issue to the jury, it clearly appears that these instructions were given. *Davis v. Brown*, 67 Mo. 313; *Smith v. Culligan*, 74 Mo. 388; *Holmes v. Braidwood*, 82 Mo. 617.

But defendant here certainly occupies a very different attitude. Seeing that the court had utterly failed to limit the recovery to the *necessary* pecuniary injury, it attempted to cure this palpable error by asking an instruction which limited the damages to the necessary injury as the statute commanded, but it was refused, and the jury had no limit but $5,000, and their own fancies or prejudices. The instruction asked by defendant was expressly sanctioned in *Owen v. Brockschmidt*, 54 Mo. 285. While counsel relied upon that case, we think it was incorrectly decided, and it is now in that respect overruled. The instruction refused in *Owen v. Brockschmidt* should have been given.

This section of our statute has been the basis of many actions and has often been before this court. It was said in *Gray v. McDonald*, 104 Mo. 303, that "the expressions, 'aggravating and mitigating circumstances,' were well known to the law when used by the legislature." It was always reserved for the court to instruct the jury what aggravating circumstances would justify exemplary damages, and this court has been careful not to permit exemplary or punitive damages unless the facts would justify them; on the other hand, the practice was as well settled that if there were facts which in law mitigated the damages, the court so instructed, but because the juries were not supposed to know what would amount to an aggravation or mitigation in law, it was and is the peculiar province of the court to instruct on these points, and not leave it to the jury. Under our practice it has always been ruled that it was error to instruct upon a state of case not in evidence. Now, if the case was one of aggravation, without circumstances of mitigation, it would be error to leave it to the jury to say the circumstances were mitigating, and *vice versa*, if no aggravating circumstances, to give smart money. *Morgan v. Durfee*, 69 Mo. 469.

In this case, the defendant, if liable at all, was simply liable for negligently omitting to maintain lights at the entrances to the elevators and safety gates. If the jury found there was negligence, and they did, the case did not authorize exemplary damages; neither was there any peculiar circumstance that would mitigate or make the defendant liable for less than the necessary pecuniary loss to plaintiffs, resulting from their father's death. This is the statutory measure of defendant's liability. There is an obvious difference between a pecuniary damage and a *necessary pecuniary* damage.

In *Parsons v. Railroad*, 94 Mo. 286, this court agreed that the parent's necessary damage was the loss

of services during minority. , In *McPherson v. Railroad,* *supra,* this court all said the child's necessary damage was a fair and reasonable compensation to the infant plaintiffs for the loss of their father's services as a means of support during their minority.

In *Morgan v. Durfee, supra,* SHERWOOD, C. J., said: "In the case last cited, it was held that, where there were aggravating circumstances, the jury should not be restricted to a mere question of dollars and cents. The obvious corollary from the adjudication in that case is, that where there are no aggravating circumstances the jury should be restricted to the pecuniary or 'necessary injury resulting from such death.'"

In *Gray v. McDonald, supra,* we held that exemplary damages could be recovered under this section. By the section the damages are limited to $5,000. Under the most aggravating circumstances no jury could, under this section, award over $5,000. If we tolerate this instruction have we not abolished all distinction between exemplary and compensatory damages? The instruction was sought and obtained by the plaintiff against the timely objection of defendant. We think it was not merely negatively wrong, but amounted to positive error in not restricting defendant's liability to the statutory measure of necessary loss, and not excluding *solatium* and pain and suffering of decedent.

It may be the damages in this case, though reaching the extreme limit fixed by law, are not unreasonable, but it seems clear that when the very gist of the action is the amount of damage suffered that the court ought not to leave it to the caprice of a jury, but should point out with reasonable certainty the proper elements to be considered in arriving at the amount of damage.

There are no well considered cases that would in our opinion justify this instruction, and if parties are

to try their cases by the rules of law, and not the whims of jurors, it is time we were expressing our disapproval of these instructions, which furnish no guide, and certainly no restriction upon the jury in cases like this.

SHERWOOD, C. J., and MACFARLANE, J., fully concur in the foregoing opinion and agree with me, the judgment should be reversed and cause remanded. BRACE and BLACK, BARCLAY and THOMAS, JJ., hold it should be affirmed, BRACE, BLACK and THOMAS, JJ., in separate opinions. The judgment is accordingly affirmed.

### SEPARATE OPINION.

BLACK AND BRACE, JJ.—We agree that the instruction on the question of damages in this case is too general, and that the criticism on it in the opinion is well made, and announces correct principles; but in this case there are four minor children who are plaintiffs, and, if they are entitled to recover anything, they are plainly entitled to the aggregate sum of $5,000, and, therefore, we are of opinion that the error is not prejudicial, and the judgment ought to be affirmed.

### SEPARATE OPINION.

THOMAS, J.—I concurred in the reversal of the judgment in this case in division number 2, but on a re-examination of the questions involved I now think the judgment ought to be affirmed, and will briefly give my reasons therefor.

Conceding the instruction on the measure of damages given by the court is subject to criticism as being too general, and operating as a roving commission to the jury, yet the defendant in this instance is in no position to complain of it. The exact question,

upon which the reversal of the judgment is now made to hinge, was not presented to, nor decided by, the lower court. The court gave substantially the instruction the defendant asked. Omitting the words, "having regard to any mitigating or aggravating circumstances attending the cause of the death," which we all agree should not have been included in the instruction in this case, the instruction given and the one refused are in substance the same. Here they are.

The instruction given: "The court instructs the jury that if they find for the plaintiffs they will assess the damages in their favor in such sum as they believe will compensate them for the pecuniary injury sustained by them in the death of said Michael McGowan not in excess of the sum of $5,000."

The instruction refused: "If the jury find a verdict for the plaintiffs, they will assess the damages at such sum (not exceeding $5,000) as they may deem fair and just with reference to the necessary injury resulting to plaintiffs from the death of Michael McGowan."

If the instruction given was a roving commission, *a fortiori* was the one refused. The general rule is that damages must be *compensatory only*. The instruction given directed the jury to "assess the damages at such sum as they believe will *"compensate"* the plaintiffs for the injury. This limitation was not warranted by the law, for this court in *Parsons v. Railroad*, 94 Mo. 286, expressly held that there is a "class of cases in which the damages, in the nature of things, must be largely conjectural, * * * as for instance * , * * when a child of tender years is suing for the death of a parent, the *pecuniary value* of whose parental care and nurture, aside from maintenance, education and support during minority, is not susceptible of adequate measurement *in dollars and cents.*" On the other hand

the refused instruction limits the damage to what the jury "may deem fair and just with reference to the necessary injury resulting to plaintiffs." It seems clear to my mind that this authorizes the jury to *rove* farther into the field of speculation, conjecture and uncertainty than the instruction that was given.

The jury, under the refused instruction, might very well have concluded that damages by way of *solatium* were included in *necessary* but not *pecuniary* injury. However that may be, I believe the words "necessary" and "pecuniary," as terms limiting and qualifying damage, have, by common consent among lawyers and judges, been always regarded as synonymous. Chief Justice SHERWOOD, in *Morgan v. Durfee*, 69 Mo. *loc. cit.* 478, so treats them, saying "the jury should be restricted to pecuniary or 'necessary injury resulting from such death.'"

But what questions did defendant intend to have the trial court decide by the presentation of the refused instruction, and what questions did the court decide in refusing it? Certainly not that the jury should allow no damage by way of *solatium*, or none that might result to plaintiffs after they arrived at their majority. No such thought was in the mind of any attorney or the judge of the court at that time. All concerned were evidently intending to frame an instruction in compliance with the former rulings of this court, commencing with *Owen v. Brockschmidt*, *supra*, decided in 1873, and ending with *Parsons v. Railroad*, *supra*, decided in 1887. This court had said time and again that the words, "having regard to any mitigating or aggravating circumstances attending the cause of the death," should not be included in an instruction in cases where exemplary damages should not be allowed, and had repeatedly held that an instruction in the language of the statute, omitting those words, was suffi-

cient.   The defendant evidently wanted the court to give its instruction, because it contained the words in regard to mitigating or aggravating circumstances, and the court refused to give it, no doubt, not because it used the word "necessary" instead of "pecuniary," but because it used words which ought not to have been used, and which this court had held ought not to have been included in it.   That this was the scope and meaning of defendant's action at the trial is evident from the fact that it cites *Owen v. Brockschmidt, supra,* in support of the refused instruction, and an examination of that case shows that this court there held that an instruction telling the jury not to allow anything "for mental anguish or wounded feelings of the plaintiff" was rightly refused.   This case was certainly not cited to support the contention made in this court that the jury should have been told not to allow anything by way of *solatium,* when the case itself holds that the jury ought not to have been told any such thing.

As far as it went, the instruction given was correct, and if defendant had desired to raise the question whether an instruction should give specifically the elements of damages allowable in cases of this character, and should specifically negative items of damages not allowable, its plain duty was to have asked the court to give such an instruction, and having failed to do this it ought not to be heard to complain now.   It is too well settled to need argument or citation of authority to support it, that in civil cases parties cannot, in an appellate court, assign as error issues not presented to nor decided by the trial court.

As to the measure of damages, this case was submitted to the jury in substantial compliance with the law as it existed at the time of the trial (March, 1888), and I think the judgment ought to stand.

In the second place, I will remark that it is evident the jury were not in fact misled by the use of the word "pecuniary," instead of "necessary." The plaintiffs (three boys and one girl) were aged five, eleven, thirteen and sixteen years respectively, at the time of their father's death, in December, 1883. The deceased was forty years old, and was earning $3 per day at the time of his death. This would have brought him an annual income of $900. His expectancy of life, according to the tables of mortality based on American experience, as given in the second volume, Revised Statutes, 1879, page 1165, was twenty-eight and eighteen-hundredths years, an expectancy extending far beyond the period at which his youngest child would arrive at its majority.

The aggregate minority of all the children at the time of the death of their father was thirty-eight years. At $150 a year for thirty-eight years, a very reasonable allowance certainly, for board, clothes, schooling, doctor's bills and other necessary expenses, would give us $5,700, $700 more than the jury allowed. This was the actual damage, *necessary* damage if you please, that plaintiffs sustained. Add to this such *conjectural* damages as a jury might reasonably award for *parental care and nurture*, and can anyone doubt that the verdict will always be, ought always to be, $5,000, under the most restricted litigation as to the measure of damages? This litigation has been pending eight years. We hold that the plaintiffs are entitled to recover for the death of their father. The verdict can not be for more than $5,000, and the setting aside of this judgment will result in the loss of the interest on $5,000 from its rendition to the next trial at six per cent. per annum, already four years, and, if we are to judge of the future by the past, it will be four years, or it may be longer, before another trial can be had. Shall we put this burden on these children? Do the circum-

:stances of the case warrant us in doing that? I think not. The case was fairly tried. The defendant did not contest it on the amount of damages, but on the grounds of its absolute non-liability. It was defeated on that issue. The damages are reasonable beyond question, so reasonable that no one can hope for a verdict for less on another trial. The setting aside of this judgment will work an absolute and irretrievable loss to plaintiffs of from $1,200 to $2,000, by way of interest, and at the end of ten or fifteen years they will get what they ought to have had at first.

I think, with all due deference to my associates, justice, humanity and *the law* demand the affirmance of this judgment.